IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATALEIGH EVANS, by her parents and next friends Lorenz Evans and Jennifer Evans; LORENZ EVANS, and JENNIFER EVANS, | ) ) ) ) | |
| Plaintiffs, | ) | No. 08 C 5593 |
| v. | ) | |
| SHARON RICHARDSON, DCFS Investigator, in her individual capacity; LATANYA LAW, DCFS supervisor, in her individual capacity; and FANNIE BLAKE, DCFS Child Protection Manager, in her individual capacity, | ) ) ) ) ) ) | Judge Robert W. Gettleman |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In a four count amended complaint plaintiffs Lorenz and Jennifer Evans, individually and as parents and next friends of their daughter, Nataleigh Evans, have sued three employees of the Department of Children and Family Services ("DCFS"), Sharon Richardson, Latanya Law, and Fannie Black, under 42 U.S.C. § 1983, alleging violations of plaintiffs' civil rights. The complaint, which stems from a child abuse investigation, alleges that defendants willfully seized Nataleigh in violation of her rights under the Fourth and Fourteenth Amendments (Count I), unlawfully searched plaintiffs' home in violation of the Fourth Amendment (Count II), violated plaintiffs' substantive due process rights to familial association (Count III), and violated plaintiffs' procedural due process rights (Count IV). Defendants have moved to dismiss the complaint for failure to state a claim. For the reasons discussed below, the motion is denied.

# FACTS[1]

On September 17, 2006, ten month old Nataleigh fell and hit her head on a coffee table. One week later, on September 24, 2006, Jennifer noticed a bump on Nataleigh's head, which was painful to the touch and appeared to have fluid in it. Jennifer called the family pediatrician and made an appointment. She took Nataleigh to the pediatrician on September 26. The doctor conducted an examination and concluded that there had been an unwitnessed fall in addition to the earlier fall on September 17. The doctor referred Nataleigh to the hospital for further tests, and informed Jennifer that she had called DCFS to report possible child abuse.

Jennifer took Nataleigh to Ingalls Hospital where she was admitted. No fractures or other injuries were found. Nataleigh was held overnight for observation and Jennifer stayed with her. At 9:20 p.m. that night a DCFS investigator met with Jennifer at the hospital. The investigator told Jennifer that she was under investigation for child abuse.

Nataleigh was cleared for discharge the following day. Prior to her discharge the nursing manager "apologized" for Jennifer and Lorenz having to deal with the "DCFS issue," and that it was clear to her and the nursing staff that "this was not a case of abuse." The nursing manager also stated that she had spoken to the referring pediatrician, who had stated that she also did not think that there had been any abuse, but felt obligated under the law to make the report.

Nataleigh was discharged later on September 27 and returned home with her parents. Later that evening defendant Richardson called Jennifer and Lorenz and arranged a home visit for the following day, September 28. Richardson visited the home on the 28th, observed

---

[1] The facts are derived from the amended complaint and are accepted as true for the purposes of analyzing the instant motion.

Nataleigh and spoke with Jennifer. Richardson saw no evidence of any further injury or any evidence that Nataliegh was in danger of being abused, and commented that it appeared that there was "nothing" to the abuse concerns and that the allegations against Jennifer and Lorenz would probably be "unfounded."

Later that afternoon, however, Richardson called Jennifer and accused her of taking Nataleigh home without DCFS permission. That night, around 8:00 p.m., Detective Boling of the Tinley Park Police Department called Jennifer and then at 9:30 p.m. two Tinley Park police officers, Boling and Officer Balzanto, went to the home. One officer told Jennifer and Lorenz that DCFS had the authority to take Nataleigh into protective custody, but he did not believe that DCFS would do so and that he did not believe abuse had occurred.

The next day, September 29, 2006, Lorenz called Richardson to tell her that while he and Jennifer had cooperated fully, he thought the investigation had gone on long enough and that they would not talk to DCFS any further. Richardson threatened Lorenz and Jennifer with "unspecified consequences" if they failed to cooperate. Richardson demanded access to Nataleigh's medical records. Lorenz told her to put her request in writing to which Richardson agreed, but never did.

Later that same day Lorenz called Richardson again, asking why the investigation was continuing. Richardson told him that a number of doctors at the hospital agreed that abuse had occurred, but refused to provide any names. Richardson told Lorenz that DCFS was "opening a case," which required Jennifer and Lorenz to allow DCFS case workers into the home on a weekly basis. Lorenz asked if a decision had been made to "indicate" the allegations against them, but Richardson said no decision had been made. Richardson then lied about having

3

contacted the references Lorenz and Jennifer had given to her previously. In the same conversation Richardson threatened plaintiffs with a requirement under which DCFS would insist that either another adult move into the house or Nataleigh move out to be cared for by another adult. Lorenz refused both options.

On Monday, October 2, 2006, Jennifer took Nataleigh to her obstetrician, who told Jennifer that Nataleigh's injury appeared to be from the fall against the coffee table, and agreed to provide a written statement to that effect. The following day Lorenz called Richardson to tell her of the obstetrician's opinion, but Richardson merely responded that she did not have to consider the information because DCFS had not appointed the obstetrician.

On the morning of Wednesday, October 4, 2006, more than a week after the initial report by the pediatrician, Richardson called Jennifer and asked to speak to Lorenz. Lorenz promptly returned the call but Richardson had already left the office. An hour later, Tinley Park police officers Boling and McCain arrived at the home to question Jennifer outside of Lorenz's presence. Jennifer told the officers of the obstetrician's opinion and the officers left. An hour after that Richardson and two other Tinley Park police officers arrived at the home. They had no warrant but entered the home without consent from Jennifer. Nataleigh was sleeping in her crib. Despite seeing no evidence of abuse or any other sign that Nataleigh was in danger of being abused, Richardson placed Nataleigh into "protective custody." Richardson would not tell Jennifer where Nataleigh would be taken, but did tell her that if a relative went to the DCFS office, DCFS would allow Nataleigh to be placed into relative care. Jennifer told Richardson that Lorenz's sister Tammy Evans of Peoria would come get Nataleigh. Richardson left

4

unsigned papers with Jennifer indicating that a temporary custody hearing was scheduled for the next day October 5, 2006, at 11:00 in Cook County Juvenile Court.

Jennifer went immediately to the DCFS office in Harvey, Illinois, where Richardson worked, demanding to see her daughter. DCFS personnel initially told her that Nataleigh was not there and that they could not tell her where Nataleigh was. One staff member said that Nataleigh would be in a shelter until after the hearing. Jennifer waited several hours for Lorenz and his sister to arrive. During that time Jennifer was allowed to see Nataleigh once for approximately 10 minutes.

While waiting, Jennifer spoke with defendant Law, who told Jennifer that Tammy Evans would not be allowed to take Nataleigh home because Tammy did not live in Cook County. Law said neither Lorenz nor Jennifer could reside with Nataleigh, so Nataleigh would have to stay in a shelter. Law then spoke with Lorenz by phone and agreed to allow Tammy Evans to take Nataleigh to plaintiffs' Tinley Park home if Lorenz and Jennifer remained out of the house. Either Richardson or Law threatened Lorenz with arrest upon is arrival at DCFS, and claimed that both Lorenz and Jennifer had refused to cooperate in an alternative action plan, although no such plan had been offered. Lorenz arrived at around 5:00 p.m., at which time Law confirmed that her supervisor, defendant Blake, had approved the decision to take protective custody.

Richardson and Law told plaintiffs that Nataleigh would stay in protective custody unless they signed an agreement that they would not have unsupervised contact with Nataleigh. Blake then came into the room and said that she was willing to allow Nataleigh to go home because she believed there was no danger. She said "mistakes were made" but still insisted that Nataleigh's return was contingent on Tammy Evans supervising all interaction between Lorenz and Jennifer.

5

Lorenz and Jennifer signed the DCFS form contract under which they could not have unsupervised contact with their daughter Nataleigh. Law also demanded that Jennifer undergo a psychiatric evaluation. Law and Blake told plaintiffs that the scheduled hearing had been cancelled. No hearing to challenge the conditions imposed by DCFS was offered.

Plaintiffs hired a lawyer the next day. A few days later the lawyer informed plaintiffs that DCFS had determined that the allegations of abuse were "unfounded." DCFS has had no further contact with the family, but has refused all requests to provide Lorenz with the investigative file.

## DISCUSSION

Defendants have moved to dismiss all four counts of the amended complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), asserting that they are qualifiedly immune from suit. When ruling on such a motion, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in plaintiffs' favor. McMillan v. Collection Prof's, Inc., 455 F.3d 754, 758 (7th Cir. 2006). The complaint must put defendants on fair notice of what the claim is and the grounds on which it rests. The factual allegations must be sufficient to state a claim that is plausible on its face, rather than merely speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A claim is facially plausible when it allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

When a Rule 12(b)(6) motion is based, as it is in this case, on qualified immunity, the court must approach the matter cautiously. See Jacobs v. City of Chicago, 215 F.3d 758, 765 n.3 (7th Cir. 2000). Qualified immunity is not just a defense from liability, but the ability to be

free from suit and must be addressed at the earliest possible stage.  A plaintiff need not anticipate, however, the assertion of qualified immunity by defendant and plead allegations that will defeat that immunity.  Id.  Nonetheless, in some cases, a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds if the plaintiff asserts a violation of a broad constitutional right that has not been articulated at the time of the alleged violation.  Id.  In most cases, however, the existence of qualified immunity will depend on the particular facts of a given case.  Because a plaintiff need not plead facts to anticipate and overcome the immunity, resolution of the issue in most cases is inappropriate on a Rule 12(b)(6) motion.

Qualified immunity is an affirmative defense that protects government officials performing discretionary functions from civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The common approach (although not mandatory) to analyzing qualified immunity defense is to first determine if there has been a constitutional violation and then consider whether the right at issue is clearly established at the time of the violation.  Jacobs, 215 F.3d at 766; see Pearson v. Callahan, 129 S.Ct. 808, 821-22 (two step analysis no longer mandatory, but discretionary).

In the instant case, plaintiffs first claim that defendants violated Nataleigh's constitutional right to be free unreasonable seizure when they removed her from her home without a court order, probable cause, or reasonable suspicion to believe that she had been abused or neglected by her parents, in the absence of exigent circumstances.  A person is seized, for Fourth Amendment purposes, when in light of all surrounding circumstances a reasonable person would not have felt free to leave.  United States v. Mendenhall, 446 U.S. 544, 554 (1980).

In this circuit, the law has been well settled that "in the context of removing a child from [her] home and family, a seizure is reasonable if it is pursuant to court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." Brokaw v. Mercer County, 235 F.3d 1000, 1017 (7th Cir. 1999).

In the instant case, the complaint alleges that Nataleigh was physically removed from her home at defendants' direction and separated from her parents. This was done without court order, based solely on the one report by the pediatrician over a week before the removal. The complaint further alleges that defendants had been informed by the hospital professionals that they did not believe any abuse had occurred. Having already allowed Nataleigh to remain with her parents for over a week, the lone pediatrician hotline report of possible abuse cannot support a finding of probable cause or exigent circumstances. Accordingly, if the facts are as plaintiffs allege, defendants should have known that removing Nataleigh without a court order was unlawful. Defendants' motion to dismiss Count I is denied.

In Count II, all three plaintiffs allege that defendants violated their Fourth Amendment right to be free from unreasonable searches by entering plaintiffs' home without a warrant or consent, and in the absence of exigent circumstances. Defendants move to dismiss this count claiming that the entry into the home was not unreasonable because the facts do not "indicate that Jennifer, who allowed entry into the residence, requested a warrant or refused to allow the DCFS investigator and the police into the home."

Defendants are incorrect. The complaint very clearly alleges that Richardson and the police entered uninvited without seeking or obtaining consent. Defendants also argue that entry

was reasonable because it was done "pursuant to a determination made after several days of investigation that Nataleigh had been abused and required protective custody." Again, however, the complaint alleges something quite different. If the allegations of the complaint are true, defendants had no information on which they could conclude that abuse had occurred and, indeed, had expressed as much to plaintiffs. Defendants clearly had no more evidence of abuse on October 4 when they removed Nataleigh than they had on September 26 when the initial report of "possible" abuse was made. According to the complaint, all the evidence gathered between those dates suggested no abuse. Yet, defendants left Nataleigh in her parents' custody during that period, but then decided to remove her without obtaining a warrant. Under those facts plaintiffs have stated a Fourth Amendment claim.

In Count III, plaintiffs allege that defendants violated plaintiffs' substantive due process right to familial relations by taking Nataleigh into protective custody without sufficient evidence of abuse and then conditioning Jennifer and Lorenz's contacts with Nataleigh upon supervised visits. Parents have a fundamental liberty interest under the Fourteenth Amendment in custody of their children, and children enjoy the concomitant right to be cared for by their parents. Troxel v. Granville, 530 U.S. 57, 65-66 (2000). Substantive due process is the appropriate vehicle for evaluating the constitutionality of the government-forced separation of Nataleigh from her parents. Brokaw, 235 F.3d at 1019.

Like Fourth Amendment rights, however, the right to familial integrity is not absolute. Id. "Substantive due process does not categorically bar the government from alternating parental custody rights." Weller v. Department of Soc. Serv., 901 F.2d 387, 392 (4th Cir. 1990). The liberty interest in familial integrity "is limited by the compelling governmental interest in the

9

protection of children, particularly where the children need to be protected from their own parents." Croft v. Westmoreland County Children and Youth Services, 103 F.3d 1123, 1125 (3d Cir. 1997). Thus, a balance must be reached between the fundamental right to the family and the state's interest in protecting children from abuse. Brokaw, 235 F.3d at 1019. This balancing is especially important in cases where children are removed from their homes. Id.

This balancing, however, is no different from that developed in the Fourth Amendment context. Id. In balancing these interests, courts have recognized that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in eminent danger of abuse." Id.; Croft, 103 F.3d at 1126.

In the instant case, plaintiffs allege that defendants lacked sufficient evidence before removing Nataleigh from her parents. According to the complaint, Nataleigh was removed from her parents' custody solely on the pediatrician's report of possible abuse. No court order was sought prior to the removal and, allegedly, no petition with the court was filed afterwards. Defendants then allegedly coerced Jennifer and Lorenz into signing a restrictive safety plan by threatening them that Nataleigh would remain in DCFS custody in an undisclosed location or group shelter. If those allegations are true, defendants infringed on plaintiffs' familial relation.

Relying on Dupuy v. Samuels, 465 F.3d 757 (7th Cir. 2006), and Dupuy v. McEwen, 495 F.3d 807 (7th Cir. 2007), defendants argue that even if the allegations are true, Jennifer and Lorenz's decision to sign the restrictive safety plan shields defendants from liability. According to defendants, the Dupuy cases specifically approve the process utilized.

10

Defendants are incorrect.  Dupuy does not sanction the type of conduct alleged in the instant case.  In analyzing the constitutionality of safety plans, the court stated:

> But sometimes, in lieu of immediately removing the child from its parents, the state will offer the parents the option of agreeing to a 'safety plan' under which restrictions short of removal are imposed pending completion of the state's investigation into abuse or neglect.
>
> .   .   .
>
> Critically, however, the decision to agree to a safety plan is optional with the parents.  If they think that if they turn down the plan the state will not try to remove the child from their custody, or that if it does they will prevail in the prompt judicial hearing to which they are entitled on the propriety of the removal, they will reject the plan.  The plan is thus a form of interim settlement agreement pending the outcome of the investigation, as when a plaintiff in a suit for restitution agrees not to move for immediate seizure of assets held by the defendant if the latter agrees to place them in judicial custody.

Dupuy v. Samuels, 465 F.3d at 760-61.

The reasoning behind Dupuy is simple.  "It is not a forbidden means of coercing a settlement to threaten to merely enforce one's legal rights.  Id. at 762.  But the court acknowledged that consent garnered through duress, extortion or other wrongful means would be involuntary.  Id. at 762-63.

In the instant case, according to the allegations of the complaint, the safety plan was not offered in lieu of removal.  It was offered after Nataleigh was removed illegally and after defendants told plaintiffs that defendants did not know were Nataleigh was or would be staying.  Defendants obtained Jennifer and Lorenz's signature on the safety plan only by telling them that it was the only way to regain custody and prevent Nataleigh from being placed in a group shelter.  Accepting these allegations, any reasonable government worker would realize such behavior amounts to a constitutional violations.  See e.g., Croft, 103 F.3d at 1125 n.1 (child

welfare worker's conduct blatantly coercive in securing a parent's separation from a child by improperly threatening to place the child in foster care). Accordingly, defendants' motion to dismiss Count III is denied.

Finally, if Jennifer and Lorenz were illegally coerced into signing the safety plan, they were obviously denied their procedural due process rights. See e.g., Hernandez v. Foster, 2009 WL 1952777 (N.D. Ill. 2009). Accordingly, defendants' motion to dismiss Count IV is also denied.

## CONCLUSION

For the reasons explained above, defendants' motion to dismiss is denied. Defendants are directed to file an answer to the complaint on or before April 16, 2010. The parties are directed to prepare and file a Joint Status Report on the court's form on or before April 20, 2010. This matter is set for a report on status on April 27, 2010, at 9:00 a.m.


**ENTER:** **March 19, 2010**

_____
**Robert W. Gettleman**
**United States District Judge**